In a hybrid proceeding pursuant to CPLR article 78 to review a determination of the Southern Region, Hudson Valley Board of Review, dated April 30, 2008, which, after a hearing, denied the application of the petitioner/plaintiff for a variance and action, inter alia, for specific performance of a lease, the respondents/defendants appeal, as limited by their brief, from so much of a judgment of the Supreme Court, Nassau County (Warshawsky, J.), dated December 1, 2008, as, upon a decision of the same court dated October 21, 2008, granted that branch of the petition which was to annul the determination on the ground that it was arbitrary and capricious.
Ordered that the judgment is modified, on the law and the facts, by adding a provision thereto remitting the matter to the Southern Region, Hudson Valley Board of Review, to grant the requested variance, subject to any reasonable condition it deems appropriate; as so modified, the judgment is affirmed insofar as appealed from, without costs or disbursements, and the matter is remitted to that entity for further proceedings.
In 2004, the New York State Office of Parks, Recreation and *1081 Historic Preservation (hereinafter OPRHP) solicited bids from private developers to undertake, and bear the expense of, the design and construction of “a signature year-round public dining and catering facility” to replace the former Boardwalk Restaurant in Jones Beach State Park. OPRHP ultimately selected a developer who later formed the petitioner/plaintiff, Trump on the Ocean, LLC (hereinafter the petitioner), to develop the state-owned site. Due to strict limitations imposed by OPRHP on the footprint and height of the building, the petitioner designed the facility with a basement that would be used for, among other things, kitchens, employee lounge areas, and utility equipment.
The petitioner and the State of New York, through OPRHR subsequently entered into a 40-year lease, according to which the petitioner was authorized to construct and operate the facility. Pursuant to the lease, the petitioner is responsible for all necessary maintenance and repairs, ordinary and extraordinary, and must obtain flood insurance for the facility, at no cost to the public.
The lease further specified that the project design was required to comply with the New York State Uniform Fire Prevention and Building Code (hereinafter the Uniform Code) and that the petitioner was responsible for obtaining any necessary approvals. In this regard, the project site is located in an area designated by the Federal Emergency Management Administration as a coastal high hazard area, in that it is subject to high-velocity wave action. Consequently, the project is subject to sections 1612.4 and 1612.5 of the Building Code of New York State (hereinafter the Building Code), a component of the Uniform Code (see 19 NYCRR 1219.1, 1221.1). (19 NYCRR 1221.1 was amended effective January 1, 2008. It is undisputed that, because the permitting process for the subject facility was commenced prior to that date, the former version of that regulation, which references the 2002 edition of the Building Code, is applicable here.) Those sections of the Building Code require that buildings constructed in flood hazard zones be designed in accordance with standards set forth in a manual, known as ASCE 24-98, published by the American Society of Civil Engineers, and that the buildings be certified as such.
As relevant to the determination under review, ASCE 24-98 essentially requires that the lowest horizontal structural member of the lowest floor of the structure be built above the elevation to which there is a 1% annual chance that flood waters might rise, or in other words, that it be built to, or above, the “design flood elevation” (hereinafter DFE). While ASCE 24-98 *1082 allows enclosed areas to be constructed below the DFE, those areas may only be used for parking, building access, and storage; they must be constructed with breakaway walls; and they cannot contain certain utility equipment. The proposed facility is also subject to Building Code § 1003.3, which requires “egress doors” to be side-hinged swinging doors (except under certain conditions inapplicable here). Accordingly, in order to construct the proposed occupied basement, which was similar to the occupied basement used in the former Boardwalk Restaurant (to which the ASCE 24-98 standards did not apply), OPRHP applied on behalf of the petitioner to the Southern Region, Hudson Valley Board of Review (hereinafter the Board), for a variance from sections 1612.4, 1612.5 and 1003.3 of the Building Code.
At the hearing on the variance application, the petitioner submitted evidence with regard to its proposed alternative to strict compliance with the above-referenced provisions. There was no opposing evidence offered. The petitioner established that through the use of “dry floodproofing”—a “floodproofing method” used to create a waterproof “structure envelope”—the facility would be designed (and certified as such) to prevent water infiltration and to “resist flotation, collapse and lateral movement” due to the effects of flood and high-velocity wave action. Further, four loading docks leading to the basement, which are located below the DFE, are designed to protect the loading entrances from any rise in groundwater, and are built to an elevation that is higher than the maximum tide surges occurring during “normal storm conditions,” as recorded by the National Oceanic and Atmospheric Administration (hereinafter NOAA). The loading docks will further be equipped with specialized flood doors, which will serve to seal the loading docks in the event of significant storms that may cause floods exceeding this elevation. In this regard, the facility will be in constant communication with the Nassau County Office of Emergency Management (hereinafter OEM), which has detailed plans to implement evacuation orders 36 hours before the arrival of storms of a magnitude that would require use of the flood doors. Electrical power and gas services also would be shut down during such an event.
After hearing the evidence, the Board denied the variance application, concluding that the petitioner had failed to make the “threshold” showing that granting the requested variance would not “substantially adversely affect [the Building Code’s] provisions for health, safety, and security” (19 NYCRR 1205.4 [a]), and, in any event, that the petitioner had also failed to demonstrate its entitlement to the variance under 19 NYCRR *1083 1205.4 (b) (3) and (5), as asserted in its application. The petitioner then commenced the present hybrid CPLR article 78 proceeding and action, seeking, as relevant here, to annul the Board’s determination on the ground that it was arbitrary and capricious. The Supreme Court, generally concluding that the Board’s reasoning was based upon misapprehensions of fact and was contradicted by the evidence, granted that branch of the petition and annulled the determination.
“While judicial review [of administrative decisions] must be meaningful, the courts may not substitute their judgment for that of the agency for it is not their role to weigh the desirability of any action or [to] choose among alternatives” (Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast, 9 NY3d 219, 232 [2007] [internal quotation marks omitted]). Rather, an agency determination “should be annulled only if it is arbitrary, capricious or unsupported by the evidence” (id. at 232). A determination is arbitrary if it is made “without sound basis in reason and . . . without regard to the facts” (Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 231 [1974]; see Matter of Marotta v Scheyer, 40 AD3d 645, 647 [2007]).
As the Board correctly interpreted its authority, it is empowered to grant a variance from provisions of the Building Code where the petitioner demonstrates entitlement to such relief upon any one of the six grounds listed in 19 NYCRR 1205.4 (b), provided that the variance would not “substantially adversely affect provisions for health, safety, and security and that equally safe and proper alternatives may be prescribed” (19 NYCRR 1205.4 [a]). Here, the Board rationally concluded that the petitioner was not entitled to a variance on the ground that strict compliance “would inhibit achievement of some other important public policy” (19 NYCRR 1205.4 [b] [3]) because the petitioner failed to present sufficient evidence to support its conclusory contention that the proposed facility would not be economically viable if the basement uses were moved to the first floor of the facility. Nonetheless, the Board’s conclusion that the petitioner failed to show that “strict compliance . . . would be unnecessary in light of alternatives” which would achieve the Building Code’s intended health, safety, and security objectives {see 19 NYCRR 1205.4 [b] [5]) was “without sound basis in reason and . . . without regard to the facts” as was, a fortiori, its conclusion that the variance would “substantially adversely affect the [Building Code’s] provisions for health, safety, and security” (Matter of Pell v Board of Educ. of *1084 Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d at 231; 19 NYCRR 1205.4 [a]; see Matter of Marotta v Scheyer, 40 AD3d at 647).
Significantly, the Board’s determination in this respect was not based upon any objection to the use of dry floodproofing, or any related concern regarding the prospective impermeability and structural integrity of the facility’s walls and foundation in the event of a flood. Rather, except for an issue concerning the ability of the Fire Department to service the facility, which was irrelevant to the specific variance application before the Board, all of the Board’s findings in support of its determination were based upon the use of the flood doors to seal the loading docks. The evidence in the record, however, served only to demonstrate that the proposed facility with the flood doors would not “substantially adversely affect provisions for health, safety, and security,” and that the petitioner’s alternative was “equally safe” as the provisions of the Building Code (19 NYCRR 1205.4 [a]).
The Board made 15 separate findings as the basis for its determination that the petitioner failed to meet its burden of proof. Most significant, as the appellants argue, the Board found (findings one through three) that the flood doors, which are horizontal sliding doors that must be operated manually, could block required exits and, thus, as characterized by the appellants’ counsel, potentially “trap employees in the basement,” threatening their “lives and safety.” With respect to this conclusion, it appears that the Board may have misapprehended that the flood doors would only be deployed under the rare circumstances of a flood emergency, while at all other times, the doors are in a recessed position. As such, three of the loading docks would almost always be available for egress. More importantly, even when the flood doors are closed, egress from the basement is provided by two staircase exits leading to the first floor, which is at the level of the DFE. The record upon which the Board’s determination was made was devoid of any evidence that these staircase exits were unsuitable to allow employees to safely exit the basement, including in the event that water should infiltrate the building. Due to the presence of these staircase exits, the Board’s conclusion that the closing of the flood doors would trap employees in the basement was irrational.
While the appellants now argue that the staircase exits do not independently conform to the Building Code’s egress requirements because they are placed too closely together, this issue is raised for the first time on appeal, and, significantly, was not the basis of the Board’s determination to deny the variance. *1085 Nevertheless, the Board may grant the requested variances subject to any reasonable conditions deemed appropriate, which, if reasonable and appropriate, could include movement of the staircase exits to provide an adequate distance between them (cf. Matter of St. Onge v Donovan, 71 NY2d 507, 516 [1988]). In this manner, the basement can be constructed to conform to the Building Code’s egress requirements, even when the flood doors are deployed, by providing the appropriate number of exits, separated by proper distance, and utilizing the side-hinged swinging doors required by Building Code § 1003.3. The loading docks simply serve, in the absence of flooding conditions, as additional, but non-essential, exits.
The Board’s remaining findings—many of which simply state a fact about the doors, without providing a nexus between the fact stated and any perceived substantial, adverse effect on the Building Code’s objectives—either similarly disregarded the facts or are irrationally speculative. In addition to the issue of blocked exits, the Board observed that the doors required regular maintenance and inspection and had to be manually operated by trained personnel (findings seven through nine). The evidence demonstrated, however, that Presray Corporation (hereinafter Presray), which designed and manufactures the doors, will be contracted to inspect the doors twice annually and that a dedicated security officer, trained by Presray in the use and maintenance of the doors, will be present at the site 24 hours per day.
The Board’s finding (finding 10) that the doors might become clogged with debris due to their location at the loading docks, and thus prevent them from being closed properly, appears to follow from the misapprehension that the doors would be used “in the course of business.” In fact, the evidence demonstrated that, when not deployed (closed), which is most of the time, the doors are recessed and covered by “protective shrouds.” In addition, the trenches in the floor through which the doors slide are similarly protected. Indeed, removing the protective door shrouds and opening the trench covers are the first steps in deploying the doors into their closed or sealed position.
The Board further found (finding six) that the doors were not certified by “an independent testing laboratory” such as Underwriters Laboratory as capable of performing their intended function. The evidence demonstrated, however, that Underwriters Laboratory does not certify this type of product and, more importantly, that Presray is certified by the Nuclear Utilities Procurement Issues Committee, which allows Presray to supply its product to the nuclear industry in accordance with federal *1086 quality assurance standards (see 10 CFR part 50, appendix B). In conjunction with this certification, the company is audited every 24 months for quality assurance purposes. The Board failed to explain why this certification process is not sufficient to meet its concerns. Moreover, the doors that will be manufactured for the subject facility will be tested first in a fixture built at the Presray plant, and again after they are installed at the subject facility, to ensure that they withstand flooding conditions without leakage. While the Board may not be familiar with the flood doors, the evidence established that the doors are not a recent, untested technology. Rather, the record contains evidence of the successful use of the doors in a telecommunications electronics switching station in New Orleans; in facilities, such as nuclear power plants and hospitals, where safety is of utmost concern; and in commercial establishments serving the public, such as hotels and banks. The petitioner also offered evidence that similar doors withstood the onslaught of hurricane conditions without incident.
While the Board cited as one of its concerns that the inflatable seals on the doors are power-operated (finding 12), it acknowledged that they could be inflated manually if power were to be shut down. The Board’s findings regarding the time required to close the doors, particularly if the seals had to be manually inflated, and the unspecified “unsafe conditions” that could occur if water reached the utility equipment in the basement (findings 12, 14, and 15), fail to take into account the type of storm for which the doors will be needed. Data recorded by NOAA indicates that tide surges resulting from “normal storm conditions” would not likely exceed the elevation of the loading dock openings. Rather, flooding conditions for which the doors would need to be deployed primarily occur when storm winds exceed 50 miles per hour. It is only in these limited circumstances that the doors would need to be deployed, and during such a significant storm, the restaurant would not be operational, particularly in light of OEM’s 36-hour evacuation policy. Indeed, the Board acknowledged that “during the type of storm warning in which the doors are most likely to be used, all of Jones Beach would be subject to a mandatory evacuation order,” which includes a shutdown of electric power and gas services. Simply put, it is not sudden emergencies, as would require very quick action', that the doors are needed to protect against, but rather, approaching storms which provide adequate opportunity to accomplish the task of evacuating and securing the building and the flood doors. Notably, the prior Boardwalk Restaurant also utilized an occupied basement, built to much lower design standards, which was never undermined by flooding.
*1087 The Board’s reasoning that the doors might mechanically malfunction in such a manner as cannot be resolved by local mechanics or the trained security officer, in communication with Presray, but rather, that Presray will have to physically come to the restaurant to service the doors, and will not have time to make the 90-minute trip before a storm hits (finding 13), is too speculative to serve as a basis for denying the variance. Notably, the doors have been used in facilities as distant from Presray’s New York offices as Texas and New Orleans. Similarly unduly speculative is the possibility that Presray, which has been in business for over 50 years, might go out of business, making replacement parts unavailable (finding 11). Again, this is not the only facility to which the doors are supplied, and it is just as easy to speculate that another business concern would emerge to fill that need should Presray go out of business.
Finally, the Board’s reasoning that the Wantagh Fire Department was not consulted as to whether it could service the facility in the event of a flood (findings 4 and 5) is not relevant to the application before it. The application before the Board was for a variance from specific provisions of the Building Code dealing with the construction of occupied spaces in a flood zone and with egress doors, which provisions are unrelated to fire department services. Indeed, the appellants indicated to the Supreme Court that the lack of input from the Wantagh Fire Department during the hearing “was mentioned in the decision as a concern. But, obviously, that’s not what the decision was based on. It was just mentioned as a concern.”
Because examination of the Board’s findings in light of the evidence reveals that its reasoning misapprehended or disregarded the facts and was overly speculative, the Board’s determination lacked a rational basis, particularly in light of the Board’s ability to impose reasonable conditions in granting the variance (cf. Matter of Long Is. Affordable Homes, Inc. v Board of Appeals of Town of Hempstead, 57 AD3d 996, 997 [2008]; Matter of Marotta v Scheyer, 40 AD3d at 647; Matter of Baker v Brownlie, 248 AD2d 527 [1998]). We, therefore, modify the Supreme Court’s judgment annulling the determination by adding to the judgment a provision remitting the matter to the Board to grant the requested variance, subject to any reasonable conditions it deems appropriate; as so modified, the judgment is affirmed insofar as appealed from. Skelos, J.P., Angiolillo, and Leventhal, JJ., concur.
Roman, J., dissents, and votes to reverse the judgment insofar as appealed from and deny that branch of the petition which *1088 was to annul the determination on the ground that it was arbitrary and capricious, with the following memorandum:
On January 9, 2004, the New York State Office of Parks, Recreation and Historic Preservation (hereinafter OPRHP) published a Request for Proposals (hereinafter RFP) to select a private developer to design, construct, and operate a new restaurant on the site of the former Boardwalk Restaurant located at Jones Beach State Park on Long Island. The RFP clearly notified prospective bidders that, “[t]he New York State Building Code will apply to all work and structures” and that the selected developer must “comply with all applicable federal, state laws and regulations, including any historic preservation laws and regulations, as applicable.” OPRHP selected a developer who later formed the petitioner/plaintiff, Trump on the Ocean, LLC (hereinafter the petitioner), and on September 25, 2006, OPRHP and the petitioner executed a 40-year lease. Jones Beach State Park has been designated by the Federal Emergency Management Agency (hereinafter FEMA) to be a coastal high hazard zone, which is defined as a coastal area that is subject to high-velocity wave action from storms or seismic sources. In essence, this classification dictated that the building had to be constructed to withstand a “100-year flood elevation.” The design and construction of buildings located in such flood hazard zones is governed by the Building Code of New York State (hereinafter the Building Code), a component of the New York State Uniform Fire Prevention and Building Code (hereinafter the Uniform Code; see 19 NYCRR 1219.1, 1221.1). Pursuant to Building Code of New York State § 1612.4, for safety purposes, the design and construction of a building located in a flood hazard area must comply with the standards set forth in the “Flood Resistant Design and Construction Manual” published by the American Society of Civil Engineers, which is commonly abbreviated as “ASCE 24-98.” The petitioner was aware of these requirements, as the lease stated that “[djesigns for all projects proposed by Lessee shall be in compliance with the NYS Uniform Building and Fire Code.”
This case arises because the petitioner’s proposed design deviates from the requirements of the Building Code and, therefore, the petitioner seeks variances from 26 provisions of the Building Code. The procedure for obtaining a variance is set forth in 19 NYCRR part 1205 et seq., which states, inter alia, that the Secretary of State has created several regional boards to review applications for variances. Each regional board of review consists of five members, including one registered architect, one professional engineer, one building code expert, one fire prevention *1089 expert, and one businessman or lawyer (see 19 NYCRR 1205.3 [a]).
Pursuant to 19 NYCRR 1205.4 (a), each regional board of review has the power to “vary or modify, in whole or in part, any provision or requirement of the Uniform Code in cases where strict compliance . . . would entail practical difficulties or unnecessary hardship or would otherwise be unwarranted; provided, however, that any such variance or modification shall not substantially adversely affect provisions for health, safety, and security and that equally safe and proper alternatives may be prescribed.”
In general, ASCE 24-98 requires that new construction in a flood hazard zone must be “designed, constructed, connected and. anchored to resist flotation, collapse or permanent lateral movement resulting from the action of hydrostatic, hydrodynamic, wind and other loads during [a] design flood.” Pursuant to ASCE 24-98 § 4.6, enclosed areas that are below the design flood level are only permitted if they are used for parking, building access, or storage.
The petitioner’s proposed design deviates from ASCE 24-98 by including an occupied basement located below design flood elevation in a flood hazard area which is subject to high-velocity wave action. The proposed basement facility would contain a kitchen, storage, ancillary offices, employee restrooms, and utility rooms. The proposed plan also includes situating electrical equipment below the design of the flood elevation. Pursuant tó section 8.1 of ASCE 24-98, “[u]tilities and attendant equipment” cannot be located below the design flood elevation.
The developer is limited by the OPRHP design criteria to a particular footprint on the first floor, and the petitioner determined that the kitchen and electrical equipment could not be located on the main floors of the facility without reducing the amount of space available for the restaurant and reducing income to the point where the facility would not be economically viable. The petitioner claimed that the Board of Review should grant the variance pursuant to 19 NYCRR 1205.4 (b) (3) because strict compliance with the Building Code would inhibit the achievement of an important public policy, namely, the construction of a restaurant at Jones Beach State Park that would generate income for New York State.
The application for the variance stated that the issues of safety and security would be addressed by the Nassau County Office of Emergency Management to prevent flooding from affecting the health and security of the building’s occupants; that the design employed dry flood-proofing or flood damage resis *1090 tant material that makes portions of the building impermeable to flood waters; and that the building would include the utilization of specially designed horizontally operating flood doors instead of side-hinged swinging doors, to close the exits to the loading docks in the basement which would be penetrable by flood waters in the event of a flood.
According to the petitioner, the horizontal sliding doors were specially designed by the Presray Corporation (hereinafter Presray), which had provided similar watertight doors for hospitals, hotels, electronic switching stations, nuclear power plants, and military installations. However, pursuant to Building Code § 1003.3.1, all egress doors must be side-hinged swinging doors unless one of the stated exceptions applies. The requested variance asserted that strict compliance with the Building Code was not required because the flood doors and the dry-flood proofed design sufficiently protected the employees and electrical equipment that would be located in the basement.
The hearing took place on March 4, 2008, before the Southern Region, Hudson Valley Board of Review (hereinafter the Board) in Garden City. Pursuant to 19 NYCRR 1205.4 (b), the Board may vary or modify a provision or requirement of the Building Code when the party seeking the variance or modification has shown by the weight of the evidence that strict compliance would, inter alia, “inhibit achievement of some other important public policy” or “be unnecessary in light of alternatives which ensure the achievement of the code’s intended objective or in light of alternatives which, without a loss in the level of safety, achieve the code’s intended objective more efficiently, effectively, or economically” (19 NYCRR 1205.4 [b] [3], [5]). To obtain the variance, the petitioner had the burden of demonstrating to the Board that the proposed plans would not undermine the Building Code’s provisions forbidding construction which substantially adversely affects health, safety, and security (see 19 NYCRR 1205.4 [a]).
*1091 The Board voted four to one to deny the variance. In a decision dated April 30, 2008, the Board determined that the petitioner failed to meet the threshold requirement of proving that granting the variance would not substantially adversely affect provisions for health, safety, and security the Board also concluded that “the proposed alternatives do not ensure safety and public welfare.” The Board rejected the petitioner’s argument that strict compliance with the relevant requirements of the Building Code would inhibit the achievement of an important public policy. The Board found in this regard “[t]he petitioner did not demonstrate to the satisfaction of the Board that it was not possible to construct an economically viable facility, which would comply with all applicable provisions of the [Building Code] at this site.”
The Board listed 16 findings in support of its determination, as follows: (1) if the proposed flood doors were closed, they would block the required exit doors; (2) the proposed doors were not automatic and, if the flood doors were closed, a person attempting to exit the basement through the basement’s exit doors would be required to open the flood doors manually; (3) at least 30 to 35 people would be working in the basement with a maximum occupancy of 85 persons; (4/5) the fire-rescue department nearest to the facility is the Wantagh Fire Department, and the petitioner had not consulted, or submitted any written comments from, that entity; (6) the petitioner had not submitted any certification from an independent testing laboratory stating that the proposed flood doors are capable of serving the function for which they were designed; (7) the proposed flood doors are not automatic and would have to be closed manually; (8) closing the proposed flood doors requires a number of steps, including removing the protective shrouds that conceal the doors, opening the trench covers, manually sliding the doors across the trench, and inflating the seals; (9) the petitioner needed trained personnel to operate the proposed flood doors; (10) the petitioner needed trained personnel to clean and maintain the doors because they could easily become damaged or clogged with debris while they were open for deliveries from the loading docks; frequent inspections and maintenance were critical to the proper operation of the doors; (11) it would be difficult or impossible to obtain replacement parts if Presray, which was the exclusive manufacturer, went out of business or stopped making this type of door at any time during the anticipated life of the building; (12) the inflatable seals would be designed to operate primarily with compressed air, with nitrogen backup; however in an emergency, LIPA, the local power company, would shut down the power and, thus, the primary means of inflating *1092 the seals might not be available; (13) Presray was located in Pawling, which was about IV2 hours away from Jones Beach; therefore, it would not be able to provide “on site remediation” in case of an emergency because, during the type of storm warning in which the doors are most likely tb be used, all of Jones Beach would be subject to mandatory evacuation and it is unlikely that a private concern such as Presray would be permitted access to the site; (14) a trained person would need about 15 minutes to close the proposed doors and it would take longer if there was no trained person at the site or if the doors did not operate properly; (15) the equipment that would be located in the proposed basement would include, but not be limited to, electric meters, disconnect switches and circuit breakers, elevator hydraulic pumps and reservoirs, refrigeration equipment, and generators; if the flood doors failed to operate properly during a flood event, the location of such equipment in the basement would give rise to unsafe conditions; and (16) the petitioner had not met its burden of proving that granting the variance would not substantially adversely affect the provisions for health, safety, and security; insufficient evidence was presented to the Board to warrant a variance; and the proposed alternatives do not ensure safety and public welfare.
Pursuant to CPLR 7803 (3), the relevant inquiry in this case is “whether a determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion.” As a general rule, an action is deemed to be arbitrary if it is taken without a sound basis in reason and generally without regard to the facts (see Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 231 [1974]).
It is well established that the scope of judicial review of an administrative determination is limited to whether there was a rational basis for the determination or whether it was arbitrary and capricious (see Flacke v Onondaga Landfill Sys., 69 NY2d 355, 363 [1987]). As the Court of Appeals explained in Matter of Jennings v New York State Off. of Mental Health (90 NY2d 227, 239 [1997]), the reviewing court may not substitute its judgment for that of the agency responsible for making the determination, and the existence of alternative rational conclusions does not warrant the annulment of the agency’s determination. Further, as explained in Matter of Consolidated Edison Co. of N.Y. v New York State Div. of Human Rights (77 NY2d 411, 417 [1991]), although a contrary decision may be reasonable and sustainable, the reviewing court may not substitute its judg *1093 ment for that of the administrative agency (see also Matter of Cowan v Kern, 41 NY2d 591, 599 [1977] [the judicial responsibility is to review the agency’s decisions, but not, absent proof of arbitrary and unreasonable action, to make them]; Matter of Stork Rest, v Boland, 282 NY 256, 267 [1940] [courts may not reject the choice made by the administrative agency where the evidence is conflicting and room for choice exists]).
It is equally well settled that where the interpretation of a statute or its application involves the “knowledge and understanding of underlying operational practices or entails an evaluation of factual data and inferences to be drawn therefrom,” the courts regularly defer to the government agency responsible for administering the statute (Kurcsics v Merchants Mut. Ins. Co., 49 NY2d 451, 459 [1980]). “In instances where special knowledge of factual data or operational practices are necessary for interpreting the relevant statute or regulation, the agency’s special expertise is entitled to deference and, if not irrational or unreasonable, the interpretation and construction given statutes by the body responsible for their administration should be upheld” (Matter of Pro Home Bldrs., Inc. v Greenfield, 67 AD3d 803, 805 [2009] [internal quotation marks omitted]). Thus, the agency’s construction of the statute is entitled to deference and, if its interpretation is not irrational or unreasonable, it will be upheld (see Matter of Howard v Wyman, 28 NY2d 434, 438 [1971]).
The Board’s findings were rationally based on the technical requirements set forth in the Building Code and ASCE 24-98. For instance, Building Code § 1003.3.1 requires that all egress doors must be side-hinged swinging doors unless one of the stated exceptions applies, and horizontal sliding doors are only permitted if they comply with eight criteria, including, inter alia, that: (1) they must be power-operated and can be operated manually in the event of a power failure; and (2) they can be opened by a simple method from both sides without any special knowledge or effort. Based upon the evidence presented at the hearing, it was rational for the Board to find that the proposed horizontal sliding doors do not provide an equally safe alternative to those criteria. The Board reasonably concluded that there was insufficient proof in the record that the flood doors designed by Presray would operate properly and function to keep water out of the basement in the event of a flood brought on by a catastrophic weather event.
Additionally, the proposed horizontal sliding doors were not in compliance with the Building Code’s requirement that power-operated horizontal sliding doors be operated quickly and by a *1094 simple method. The proposed doors, which are manually operated, require an individual with training just to close the doors, a procedure which can take up to 15 minutes. The alternative plan proposed by the petitioner required the specially trained individual to be on premises constantly in order to close the proposed flood doors in the event of an emergency. The Board had reasonable doubts about food service employees operating the doors in the event a trained security officer was absent during an emergency.
As also specified by the Board in finding No. 6, there was no proffered testimony by any independent expert as to the capability of the flood doors operating under storm conditions. The Board’s conclusions highlighted its concerns that the viability of the doors was premised only upon the testimony of Jason Smith, the President of Presray, who will sustain a substantial economic benefit from the purchase of doors manufactured and designed by his company.
Thus, in assessing the evidence presented by the petitioner, the Board reasonably noted that the petitioner failed to present testimony or evidence from an independent expert as to the viability of Presray’s flood doors in this designated coastal high hazard area, thereby making an insufficient showing to support the variance. The Board’s concerns about the ability of the doors to function properly had a rational basis, that being the health, safety, and security of the 30 to 35 individuals whom the petitioner expects to. be working in that basement area. Although the majority states that the flood doors have been commissioned for use in other types of facilities, the safety standards in other facilities are not necessarily the same standards as those mandated by the Building Code for a building in this coastal high hazard area.
The Supreme Court relied on the facts that Nassau County had an emergency evaluation plan and that the Wantagh Fire Department normally! provided services at Jones Beach. The Supreme Court stated magnitude would have that, “at the very least, concern for life of those in the basemient seems irrelevant as a storm of that caused an evacuation of Jones Beach im *1095 mediately and there was no testimony to support a supposition that it would not.” The Supreme Court disregarded the inherent uncertainty of predicting the likelihood and severity of a sudden catastrophic storm that could wash out roads and access to the basement. This reasoning would allow the local county’s emergency procedures to replace ASCE 24-98, which provides the specifications for designing buildings that can protect human life in the event of a flood.
The Board’s determination was not arbitrary and capricious, and was based upon rational findings. The Building Code is clear that basements constructed in flood zones should not be utilized for employee work areas. The alternatives proposed by the petitioner contravene the purposes of the Building Code and raised reasonable and rational concerns. The Supreme Court improperly substituted its judgment for that of the Board, whose members included an architect, a businessman, a fire prevention expert, and a Building Code expert. The Supreme Court failed to give the proper weight and deference to the Board’s determination, which involved factual evaluations that required highly technical and specialized expertise. The Board reasonably denied the variance, as the presentation made by the petitioner was deficient in showing that the alternative plans were sufficient to protect the safety of the occupants. Although the majority states that the petitioner’s proffer was unopposed, that does not excuse the fact that a sufficient showing must be made by the petitioner, who bears the burden of proof (see 19 NYCRR 1205.4 [b]).
There is no evidence in the record that the Board acted in a manner that was arbitrary, unreasonable, irrational, or indicative of bad faith. Moreover, there is no evidence that the Board’s determination was based on any impermissible considerations such as public opinion or community pressure (see Matter of Wal-Mart Stores v Planning Bd. of Town ofN. Elba, 238 AD2d 93 [1998]). The Board’s determination was not capricious or speculative, and was founded on a rational analysis of the highly technical engineering requirements of the Building Code. Under these circumstances, the Supreme Court should not have disturbed the Board’s determination to deny the petitioner’s application for a variance from the relevant provisions of the Building Code.
Motion by the petitioner/plaintiff-respondent on an appeal from a judgment of the Supreme Court, Nassau County, dated December 1, 2008, inter alia, to strike two exhibits to the brief of the respondents/defendants-appellants and any references to *1096 those exhibits on the ground that they contain or refer to matter dehors the record. By decision and order on motion dated November 16, 2009, that branch of the motion was held in abeyance and referred to the panel of Justices hearing the appeal for a determination upon the argument or submission thereof.
Upon the papers filed in support of the motion, the papers filed in opposition thereto, and upon the argument of the appeal, it is
Ordered that the branch of the motion which was to strike two exhibits to the brief of the respondents/defendants-appellants and any references to those exhibits on the ground that they contain or refer to matter dehors the record, is granted, and the subject exhibits and any reference thereto in the appellants’ brief have not been considered in the determination of the appeal.
Appellate review is limited to the record that was made in the Supreme Court and, absent matters that may be judicially noticed, new facts may not be introduced at the appellate level (see Bindler v Brown, 133 AD2d 602, 603 [1987]). In this case, neither of the proffered exhibits warrants judicial notice (see Tippetts-Abbett-McCarthy-Stratton v New York State Thruway Auth., 15 AD2d 598 [1961]; cf. Chateau Rive Corp. v Enclave Dev. Assoc., 22 AD3d 445 [2005]). Skelos, J.P., Angiolillo, Leventhal and Roman, JJ., concur.